MISSOURI, K. & T. RY. CO. OF TEXAS v. MOORE. (No. 7192.)

(Court of Civil Appeals of Texas. Dallas. Jan. 2, 1915.)

1. DEATH (§ 13*) — ACTION FOR DEATH OF CHILD—RIGHT TO RECOVER.
    A parent cannot recover for the death of a child unless defendant was guilty of a breach of duty.
    [Ed. Note.—For other cases, see Death, Cent. Dig. § 48; Dec. Dig. § 13.*]

2. NEGLIGENCE (§ 39*)—CARE OF PREMISES—INVITATION TO CHILDREN.
    An owner of premises who invites or allures a child into a place of danger and negligently injures it while there may be liable therefor, in the absence of contributory negligence.
    [Ed. Note.—For other cases, see Negligence, Cent. Dig. § 55; Dec. Dig. § 39.*]

3. NEGLIGENCE (§ 32*)—CARE OF PREMISES—INVITATION TO ENTER.
    Where a person enters on the private property of another by invitation of the latter, a lawful relation is established, and the law imposes on the latter a duty to exercise reasonable care for the safety of the former.
    [Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 42–44; Dec. Dig. § 32.*]

4. NEGLIGENCE (§ 39*)—CARE OF PREMISES—INVITATION TO CHILDREN.
    A railroad company which maintains a reservoir occupying a block and located on ground higher than the surrounding ground and filled with water pumped into it through a pipe, and which permits grass to grow on a strip between the fence surrounding the reservoir and the reservoir, which grass is greener than the grass outside the fence, does not maintain an unusually attractive place for children, and is not liable for the death of a child drowned in the reservoir after passing through a defect in the fence.
    [Ed. Note.—For other cases, see Negligence, Cent. Dig. § 55; Dec. Dig. § 39.*]

5. NEGLIGENCE (§ 39*)—CARE OF PREMISES—INVITATION TO CHILDREN.
    Where a child passed through a defective fence surrounding a reservoir maintained by a railroad company, to get grass between the fence and the reservoir, and fell into the reservoir, there could be no recovery for the death of the child by drowning, on the theory that the reservoir was unusually attractive to children, and that the company failed to exercise reasonable care for the safety of children.
    [Ed. Note.—For other cases, see Negligence, Cent. Dig. § 55; Dec. Dig. § 39.*]

6. APPEAL AND ERROR (§ 1175*)—DISPOSITION OF CASE ON APPEAL.
    Where a case was fully developed on the trial, the court, on appeal from an erroneous judgment, will render a proper judgment.
    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4573–4587; Dec. Dig. § 1175.*]

Appeal from District Court, Grayson County; W. M. Peck, Judge.

Action by F. S. Moore against the Missouri, Kansas & Texas Railway Company of Texas. From a judgment for plaintiff, defendant appeals. Reversed and rendered.

C. C. Huff, of Dallas, and Head, Dillard, Smith, Maxey & Head, of Sherman, for appellant. E. J. Smith, of Denison, and Freeman & Batsell, of Sherman, for appellee.

TALBOT, J. This is an action by appellee, F. S. Moore, to recover of appellant, Missouri, Kansas & Texas Railway Company of Texas, damages on account of the death of his son, Richard Moore, who was 6½ years of age, which is alleged to have occurred at Denison, Tex., July 29, 1912, by reason of the said Richard falling into a reservoir belonging to appellant and drowning. Plaintiff alleged and proved, in substance, that on the date mentioned and for a number of years prior thereto, the appellant owned and maintained, just outside the corporate limits of the city of Denison, Tex., a reservoir constructed for the purpose of impounding water to be used in connection with the railway business in which it was engaged. The reservoir occupied all of block 1600 between Main and Woodard streets, near the west portion of said city, and there were a good many residences near it. It

was built of cement or concrete, which sloped inwardly from the margin around the outer surface thereof toward the center at an angle of 30 or 40 degrees. There was a 10-inch pipe extending from the bank into the reservoir, through which water was pumped into the reservoir when needed. On the day appellee's son was drowned the water in the reservoir was about 12 or 15 feet deep in the center and gradually lessened in depth, according to the angle of the walls of the reservoir, to its surface around the margin of the reservoir. The reservoir was inclosed with a fence made of cedar posts, pine planks, and barbed wire, and was of the following dimensions: On the north side 307 feet, on the south side 304 feet, on the east side 231 feet, and on the west side 192 feet. The cedar posts were 8 feet apart, and there were 7 planks in each panel of the fence, placed horizontally 4 or 5 inches apart. There were two strands of barbed wire in the fence, the first strand was 5 inches above the top plank and the second strand 10 inches above, making the fence, from the top of the wire to the ground 6 feet and 5 inches. The reservoir was upon ground higher than that around it, and its embankment was higher than the surface of the ground and of irregular height. On the northeast corner it was 3 or 4 feet above the ground, and on the west side it was 35 or 40 feet high. The distance from the inside of the fence to where the slope of the reservoir began was 2 or 3 feet, and on this space of ground there was growing, at the time of the accident resulting in Richard Moore's death, grass which was greener than the grass on the outside of the fence. About two months prior to the accident the fence around the reservoir was repaired by appellant's servants, and placed in apparently good condition, but for several days, and probably for a period of two or three weeks immediately preceding the death of Richard Moore, there were two or three planks off the fence in one or two different places making openings through which children or even grown persons could pass into the inclosure and to the reservoir. These planks were rotten at the end, and, according to the testimony of one witness on his direct examination, "they had the appearance of having dropped off or of having been blown off by the wind, or something." On cross-examination of this witness, he said that he did not notice close enough to tell whether they fell off or whether somebody had pulled them off. The appellant, by three signs posted near the reservoir, one at the southeast corner, one at the southwest corner, and one at the northwest corner thereof, warned persons not to enter the inclosure and trespass upon its property. The reservoir was attractive to people generally, and especially to children. A great many persons when water was being pumped into the reservoir, and especially on Sunday afternoons, would go near the reservoir to view it, but none of them, so far as the proof shows, ever on such occasions went on the inside of the fence inclosing it. A good many children, however, prior to the death of Richard Moore, and on several different occasions, were seen on the inside of the fence, playing near the edge of the water, and one or more times on the pipe through which water was pumped into the reservoir. There is also evidence to justify the finding that appellant knew they had been seen on the inside of the fence, but not at the time of the accident. Richard Moore, the deceased, was in the habit of visiting and playing with the children of Mr. and Mrs. G. T. Howard, who resided about 215 feet from the reservoir. On the day of the accident he went to their home and, after playing ball with the Howard children awhile, he and James Howard, a boy about 12 years old, went to the reservoir to get grass for guinea pigs, the grass on the reservoir inclosure being greener than that on the outside of the fence. The boys entered the inclosure through a hole in the fence made by two of the planks being off on the north side of the reservoir. James Howard, the little boy who was with Richard Moore when he lost his life, testified:

"I am 13 years old. I knew Richard Moore in his lifetime. I know James Moore; he is here now. When we lived on Woodard street they lived east of us about two or three blocks. I and the Moore boys were friendly and played together. We lived right near this reservoir. I have seen other children inside the reservoir and about there. They would be running around the place and walking around it. In the winter time I seen them in there skating. I do not know how they got in there; I would be tying the cow out and notice them in there. I never seen them up there but one day, when they were on the ice. Just once and awhile I seen them up there when there wasn't any ice. I remember about the little Moore boy getting drowned up there, I was with him at the time. That was about 5 o'clock in the afternoon. We went from my house to go there. We went there for some grass for guinea pigs; they were my guinea pigs. The Moore boys had been up to my house the most of the day, had been there with me and my brother during the day. The grass on the inside of the fence was greener than that on the outside. On this occasion we went on the inside of the reservoir. We went through a hole where the planks were off. There were two planks off on the north side of the reservoir. We went up there and went inside and was getting grass, and I think as we were getting up to leave Richard slipped on the cement around the reservoir, and we went in. When he slipped I was between him and the water. I was standing right by the edge of it, just a little bit from it below him. When he slipped he hit my foot, and I was not expecting it and I went in the water, and Richard, too. Richard was further out from the bank than I was. I went under; they said I went down the second time. I do not remember myself. I had my clothes and shoes on. I saw Richard after he came up, I never seen him afterwards. When he slipped in he went under and came up away out. He was smaller than I was. I do not think that Richard could swim. I know how to swim a little bit. As to how I got out, Mamma pulled me out with a rope."

This witness further testified:

"There wasn't anything that attracted my attention to the reservoir that I know of. We just went in there to get some grass"

—and that the people going to look at the reservoir generally stayed on the outside of the inclosure, and that he never saw any grown people on the inside of the fence. There seems to be no contention that appellee or his wife were guilty of negligence. Upon the conclusion of the evidence appellant requested the giving of a special charge directing the jury to return a verdict in its favor. This charge was refused and the case submitted to a jury on special issues. The jury's findings of fact were favorable to appellee, and upon them judgment was rendered for him in the sum of $3,000. From this judgment the appellant appealed.

The first assignment of error complains of the court's action in overruling its general demurrer to the appellee's petition, and the second assignment is to the effect that the trial court erred in refusing to instruct the jury to return a verdict in favor of appellant, as requested by appellant, because the evidence is insufficient to entitle the appellee to recover. The proposition under the latter assignment is as follows:

"In a suit by a parent for damages on account of the death of his child alleged to be due to the negligence of the railway, and the evidence fails to show a duty owing to the child by the railway, and that a breach of same caused the child's death, a verdict should be instructed for the railway."

There is doubtless force in the contention of appellant that, under the decisions of this state, appellee's petition fails to state a cause of action, but we are not so sure of that fact and prefer to dispose of the appeal on the conclusion reached upon a consideration of the second assignment of error and the proposition asserted thereunder, about the correctness of which we have practically no doubt.

[1] The doctrine is fundamental that, in action to recover damages for injuries to or the death of children, as in cases where damages are sought to be recovered for the death or injuries to adults, there can be no recovery unless the defendant has been guilty of a breach of duty; but, as suggested in the case of City of Indianapolis v. Emmelman, 108 Ind. 530, 9 N. E. 155, 58 Am. Rep. 65, this fundamental fact is sometimes lost sight of, and "in dealing with cases which involve injuries to children, courts and juries have sometimes strangely confounded legal obligation with sentiments that are independent of law." Among the authorities, however, there is quite a conflict as to what the duty of a railway company is to children who come upon its premises as trespassers or mere licensees. But Mr. Elliott in his work on Railroads, says that he believes—

"the true rule to be that, although the age of the child may be important in determining the question of contributory negligence or the duty of the company after discovering him, the company is, in general, no more bound to keep its premises safe for children who are trespassers, or bare licensees not invited or enticed by it, than it is to keep them safe for adults."

Clearly the correct conclusion to be drawn from the adjudicated cases and elementary works on the subject is that the owner who has neither expressly nor impliedly invited the public to come upon his premises is under no legal obligation to keep them free from pitfalls or in a condition of safety for these persons, whether adults or infants, who in the pursuit of his own pleasure or convenience go upon or pass over such premises, even though it be with the acquiescence of the owner.

"The licensee takes his license subject to its concomitant perils, and the licensor, as a general rule, owes him no duty except to refrain from willfully or wantonly injuring him, or to exercise ordinary and reasonable care after discovering him to be in peril." Elliott on Railroads (2d Ed.) § 1250.

[2] There is a difference, however, between a license and an invitation, and the general rule seems to be that if the owner of premises invites or allures a child into a place of danger, and negligently injures such child while there, it may be held liable, in the absence of contributory negligence for such injury. Instances of this character are found most frequently in cases where children were allured upon the premises of railway companies by attractive machinery, such as turntables. Indeed, it seems that the rule as to liability for injuries to children from attractive machinery had its development largely from injuries on railroad turntables as an attractive thing to play with, the danger of which they could not appreciate, and in many cases, the first of which was Railroad Co. v. Stout, 17 Wall. 657, 21 L. Ed. 745, where it is held that leaving a turntable unlocked and unguarded in an exposed place where children are likely to be attracted by it may be considered as a constructive invitation to them and negligence rendering the railway company liable for such injuries as they may receive thereby. 29 Cyc. page 463. The tendency of the decisions of our Supreme Court and of the courts of last resort in many other jurisdictions is to limit the rule to cases involving injuries received by children while playing on turntables so exposed and accessible, while some of the ablest courts of the country refuse to recognize and apply the rule, even in that class of cases. The view taken by some of the latter decisions seems to be that children who are attracted to railroad premises and injured by unlocked and unguarded turntables are trespassers and cannot recover, for the reason that railway companies are under no obligation to mere trespassers, even though they are infants, to keep their premises in a safe condition.

[3] It is held, however, by our Supreme Court, that if a person enters upon the private property of another by invitation of

the owner, a lawful relation is thereby established, and the law imposes upon the owner in such case a duty of care for his safety the degree of which is ordinarily reasonable care. It is also held that such invitation may be express or implied, but the court does not subscribe to the broad proposition that if the owner places or permits anything upon his property which is attractive to others and one is thereby induced to go thereon, an invitation to do so may be inferred as a fact by the court or jury. Railway Co. v. Morgan, 92 Tex. 98, 46 S. W. 28. In denying the soundness of such a contention in the case just cited, the court said:

"Now, since it is manifest that to some classes of persons, such as infants, the things ordinarily in existence and use throughout the country, such as rivers, creeks, ponds, wagons, axes, plows, woodpiles, haystacks, etc., are both attractive and dangerous, it is clear that the adoption of such a broad contention would be contrary to reason, lead to vexatious and oppressive litigation, and impose upon owners such a burden of vigilance and care as to materially impair the value of property and seriously cripple the business interests of the country. Therefore it has been generally held that the invitation cannot be inferred in such cases. These cases rest upon the sound principle that where the owner makes such use of his property as others ordinarily do throughout the country there is not, in legal contemplation, any evidence from which a court or jury may find that he had invited the party injured thereon, though it be conceded that his property or something thereon was calculated to and did attract him."

It is held that to warrant such an inference of fact, the object or thing which induced the person to go upon the premises must, on account of its nature and surroundings, be especially and unusually calculated to attract, and does attract, him to do so. That ponds or reservoirs, however, are not to be classed with turntables, and that the doctrine of the "turntable cases" should not be extended, is clearly manifested by the remarks of our Supreme Court in Railway Co. v. Morgan, supra, and other cases decided by that court, and that this view is supported by the weight of authority can hardly be denied. In Railway Co. v. Edwards, 90 Tex. 65, 36 S. W. 430, 32 L. R. A. 825, the negligence was alleged to consist in keeping a yard in which children were accustomed to play, and in piling a number of railroad bridge ties in such manner that they fell upon the plaintiff, a minor, while playing upon them and injured her. The facts were, in substance, that the railway company—

"owned a lumber yard, which was used for the purpose of storing bridge material and other like lumber. It was fenced, except upon one side along the company's railroad tracks. The plaintiff at the time of the accident was about eight years old, and lived with her mother just across an alley from the yard. Not being fenced along the track, the yard was easily accessible. It was shown that the plaintiff and other children were accustomed to resort there for the purpose of playing, but it was also shown that they were uniformly ordered out by the servants of the company. The parents of some of them were also warned to keep them away. It appeared, however, that, notwithstanding the persistent efforts of the servants of the company, the children would return. Just before the accident happened the plaintiff was sent home by the watchman, and went out, but as soon as he was called away by other duties, she returned. In attempting to climb upon the pile of bridge ties one of them fell down and crushed her toes. There was evidence tending to show that the ties were insecurely stacked. The mother of the plaintiff testified, in effect, that she knew of the plaintiff's having visited the yard on former occasions, and had punished her several times for it."

In passing upon this case, the Supreme Court, after stating that there are a class of cases which hold that the owner of land may not place upon it dangerous machinery, which is alluring to children, without securing it so as to protect them against injury while tampering with it, and after referring to the cases of Evansich v. Railway Co., 57 Tex. 123, and Railway Co. v. Stout, 17 Wall. 657, 21 L. Ed. 745, said:

"This line of decision has not been uniformly followed, and has met with much adverse criticism, and it seems to us that, with respect to the care which the owner of land is required to exercise, in order to secure from injury children who may trespass upon it, they go to the limit of the law. They proceed upon the ground that turntables are attractive to children. In both of the cases cited stress was laid upon this fact, and also upon the fact that the use of the turntables by children was known to the servants of the defendants. The ruling in these cases must be justified, we think, upon one of two grounds: Either that the turntables possess such peculiar attractiveness as playthings for children that to leave them exposed should be deemed equivalent to an invitation to use them, or that, when unsecured, they are so obviously dangerous to children that, when it is discovered that they are using them, it is negligent on the part of the owner not to take some steps to guard them against the danger. But when it is said that it is enough that the object or place is attractive or alluring to children, and when it is said, as has been intimated, that the fact that they resort to a particular locality is evidence of its attractiveness, the question suggests itself, What object or place is not attractive to very young persons who are left free to pursue their innate propensity to wander in quest of amusement? What object at all unusual is exempt from infantile curiosity? What place, conveniently accessible for their congregation, is free from the restless feet of adventurous truants? Here the language of an eminent judge in disposing of a similar case is appropriate: 'There are streams and pools of water where children may be drowned; there are inequalities of surface where they may be injured. To compel the owners of such property either to inclose it or fill up their ponds and level the surface so that trespassers may not be injured would be an oppressive rule. The law does not require us to enforce any such principle, even where the trespassers are children. We all know that boys of eight years of age indulge in athletic sports. They fish, shoot, swim, and climb trees. All of these amusements are attended with danger, and accidents frequently occur. It is a part of a boy's nature to trespass, especially where there is tempting fruit; yet I never heard that it was the duty of the owner of a fruit tree to cut it down because a boy trespasser may possibly fall from its branches. Yet the principle contended for by the plaintiff would bring us to this absurdity if carried to its logical conclusion. Moreover, it would charge the duty of the protection

of children upon every member of the community except their parents.'"

The court concluded that there was no ground for claiming an implied or constructive invitation to children to come upon the railway company's yard, and that, applying the principles of law announced to the facts of the case the plaintiff was not entitled to recover.

In the subsequent case of Dobbins v. Railway Co., 91 Tex. 62, 41 S. W. 62, 38 L. R. A. 573, 66 Am. St. Rep. 856, the plaintiff's child, less than three years old, was drowned in a pool of water several feet deep, situated on the defendant's right of way near its station, Letot. There were several houses near the pool, one of which was the defendant's section house about 200 feet therefrom, in which the plaintiff, Dobbins, lived with his family. The plaintiff had been, up to within two weeks of the accident, the section foreman of the defendant and as such foreman cleaned out the pool of water under orders of his superior, the roadmaster, whenever it became necessary. There was evidence from which the jury could have found that the pool was attractive and dangerous to little children of the age of the plaintiff's child; that such children, including the deceased, had, before the accident, often played around same, throwing pebbles into it, catching crawfish, etc.; that no precautions were taken by the company to prevent such children from getting into the pool; that the defendant company was, some time before the accident, informed of such facts, and requested by plaintiff to remove the pool, which was not done. Plaintiff's child escaped alone from the section house, under circumstances warranting a finding that neither he nor his wife was guilty of negligence, and a short time thereafter was found drowned in the pool. In disposing of this case, on writ of error, the Supreme Court said:

"The common law imposes no duty upon the owner to use care to keep his property in such condition that persons going thereon without his invitation may not be injured. In considering the question as to whether a duty exists there is no distinction between a case where an infant is injured and one where the injury is to an adult, though where the duty is imposed the law may exact more vigilance in its discharge as to the former. If there be no duty the question of negligence is not reached, for negligence can in law only be predicated upon a failure to use the degree of care required of one by law in the discharge of a duty imposed thereby. Since the common law imposes no duty on the railroad to use care to keep its right of way in such condition that persons going thereon without its invitation may not be injured, and since there is no evidence in the record from which the jury could have found such an invitation to the child, it was no more liable in law for its death than would have been a neighbor had it wandered into his uninclosed lands and been drowned in his tank or creek or been killed by falling down his precipice. * * * The difficulty about these cases is that they either impose upon owners of property a duty not before imposed by law, or they leave to a jury to find legal negligence in cases where there is no legal duty to exercise care.

In these cases the courts, yielding to the hardships of individual instances where owners have been guilty of moral, though not legal, wrongs in permitting attractive and dangerous turntables and water holes to remain unguarded on their premises in populous cities to the destruction of little children, have passed beyond the safe and ancient landmarks of the common law and assumed legislative functions in imposing a duty where none existed. As a police measure the lawmaking power may, and doubtless should, without unduly interfering with or burdening private ownership of land, compel the inclosure of pools, etc., situated on private property in such close proximity to thickly settled places as to be unusually attractive and dangerous, and impose criminal and civil liability, or both, for failure to comply with the requirements of such law. When such a duty is imposed the courts may properly enforce it or allow damages for its breach; but not before."

We have thus liberally quoted from the cases mentioned because we believe the case at bar is not distinguishable from them in principle and is therefore ruled by them.

[4] It is true the jury found that the appellant's reservoir was unusually attractive to children and reasonably calculated to cause children of the age and discretion of the deceased to enter thereon through the openings in the fence surrounding same at the time of the accident, that the appellant was guilty of negligence in maintaining its reservoir and the said fence in the condition they were in at and prior to the death of Richard Moore, and that the appellant by fencing its reservoir and by permitting said fence to be in the condition it was in at the time of and just prior to the accident indirectly extended an invitation to children of the age of Richard Moore to enter said inclosure, but we are of opinion that these findings were not authorized by the evidence, or do not furnish a sufficient basis, under the decisions of our Supreme Court, for the judgment rendered. There is evidence that the reservoir was attractive to children, and that on several occasions children were seen on the inside of the fence inclosing it, and evidently it was upon this testimony that the jury concluded that it was unusually attractive to them, but we fail to see that the reservoir, as constructed and maintained, possessed any materially greater attraction for children than any other large pond or reservoir of water would have for them. That all lakes, ponds, creeks, or reservoirs of water have an attraction for boys cannot well, nor need it for the purposes of this case, be denied. But, unless the reservoir in question was especially and unusually attractive to children, no invitation to go near it or to use it could be implied, and hence appellant could not, under the decisions of this state and of many others, be charged with a violation of duty in failing to securely fence or guard it against their intrusion. The suggestion that the reservoir was peculiarly and unusually attractive because located on ground higher than that around it, and because of its size and the pipe through which water was occasionally pump-

ed into it, is, we think, of little force. Such features, which in a measure distinguish appellant's reservoir from the ordinary and usual lake or pond of water to be found, are, we think, insufficient to establish the existence of that attractiveness contemplated by our decisions. The only basis for the claim that the reservoir was unusually attractive is the fact that it was supplied with water pumped through a 10-inch pipe, extending several feet out into it. There was clearly nothing peculiarly attractive about the pipe itself, and it was only when water was being pumped into the reservoir that the attractiveness claimed existed. This was infrequent, and the water flowing from the pipe when being pumped could easily be seen from the outside of the inclosure. Besides, there is no pretense that water was being pumped into the reservoir at the time the deceased went upon appellant's premises and was drowned. But, judging from the expressions found in the cases to which we have referred, it may be doubted whether the Supreme Court of this state would class a reservoir possessing even the attractiveness claimed for the one in question with turntables and apply the doctrine of the turntable cases. In Peninsular Trust Co. v. City of Grand Rapids, 131 Mich. 571, 92 N. W. 38, the Supreme Court of the state of Michigan, following the case of Ryan v. Towar, 128 Mich. 463, 87 N. W. 644, 55 L. R. A. 310, 92 Am. St. Rep. 481, in which there was an exhaustive review of the authorities upon the subject, held that:

"Though a city water reservoir was so constructed that its top was 25 feet above the street with a sloping surrounding surface, with a slope on the inside of about 45 degrees, and there was a hole under the fence so that children could and did enter, there could be no recovery for the death of a child drowned therein."

It does not appear that water was pumped into this reservoir through a pipe extending out into it, but it was claimed that, by reason of its construction, location, and appearance:

"It had a great tendency to attract and did excite the curiosity of and was an attractive place for children to play, many of whom frequented the same as a matter of childish curiosity."

In that case the child for its pleasure and amusement was, unlike the little boy in the instant case, making use of the reservoir itself. She left home in the morning and went away to play. One of her playmates told her that there were flowers "up here," and with a companion 10 years of age, she left the traveled portion of the street, went through under the fence, removed her shoes and stockings, and in attempting to wade in the water of the reservoir was drowned. Under these circumstances the court held a recovery could not be had. So in the case before us, applying the principles announced in the cases cited, we are of opinion that the appellee was not entitled to recover. The evidence shows, we think, that the deceased went upon appellant's premises without its invitation and lost his life while there through the violation of no duty imposed upon it by law. Having gone upon appellant's premises without its invitation, the law imposed no duty upon it to use ordinary care to keep its fence surrounding the reservoir in good repair; and, appellant not being aware of the deceased's presence and danger, no duty of care for his protection while there was imposed. There being no duty resting upon appellant to guard its reservoir or to exercise care for Richard Moore's safety—

"appellant was not guilty of such negligence as created liability for his death, for actionable negligence can, in law, only be predicated upon a failure to use the degree of care required of one by law in the discharge of a duty imposed thereby."

It appearing that no duty arose upon the part of appellant, a violation of which caused the death of the deceased, appellee was not entitled to recover.

[5] But, if we are mistaken in our conclusion that the evidence shows that appellant's reservoir was not unusually attractive to children, or not to be classed with turntables, and that therefore appellant was under no legal obligation to guard it against the intrusion of persons who might go near it or use it for their own convenience, pleasure, or purposes, or to maintain it in a suitable condition for them, still appellee was not entitled to recover. For whatever may have been the attractions of the reservoir, the deceased was not at the place of the accident because of such attraction. He was not there to see the water flow from the pipe extending out into the reservoir, for water was not then being pumped, nor was he there to play on the pipe or to fish, bathe, or skate. The undisputed evidence shows that he was there with his playmate and companion, James Howard, to get some grass for guinea pigs, the grass in the inclosure being greener and supposedly better than the grass on the outside. This, and not any allurement of the reservoir, induced him to go upon appellant's premises and into the danger that resulted in his death. It was essential to appellee's right of recovery, not only that appellant's reservoir was unusually attractive to children, but that the deceased was allured to the place of the accident thereby. The seeming contention of appellee that if the grass growing near the reservoir attracted the deceased and induced him to enter the inclosure, appellant would be liable in damages for his death, is, we think, without merit. To sustain such a contention would be, in effect, to hold that, if the owner constructs a pond or reservoir upon his premises for his own use, and permits grass to grow dangerously near such pond or reservoir, without exercising care to so fence the same as to prevent the intrusion of children, and a child seeking grass

near the reservoir falls in and drowns, he can be held liable for such death. To such a doctrine we are unwilling to subscribe. It certainly cannot be sustained on the theory that "green grass" is unusually attractive to children. Such a rule would render it necessary for a man to exercise care to so fence his meadow, in order to escape the charge of negligence and liability for the death or injury of a venturous boy resulting from the gore of a cow or kick of a horse grazing thereon, and certainly the law does not devolve any such duty upon the owner of land. The untimely death of the little boy is deeply to be regretted, but we have reached the conclusion that, in no aspect of the case, was appellee entitled to recover, and appellant's requested charge, instructing the jury to return a verdict in its favor, should have been given. This disposes of the appeal, and the other assignments need not be considered.

[6] The case seems to have been fully developed, and that it would be useless to remand it for another trial. It, therefore, becomes our duty, under the statute, to render in this court such judgment as should have been rendered in the court below. It is therefore ordered that the judgment of the district court be reversed, and that judgment be here rendered for the appellant.

Reversed and rendered.