### TEXAS PUBLIC SERVICE CO. et al. v. LAUGHEAD et ux.
### No. 2992.

Court of Civil Appeals of Texas. El Paso.
July 12, 1934.

Rehearing Denied July 26, 1934.

W. M. Ryan and Baker, Botts, Andrews & Wharton, all of Houston, for appellants.

Weaver H. Baker and Stevenson, Baker & Knetsch, all of Junction, for appellees.

HIGGINS, Justice.

This is a suit by C. C. Laughead and wife against the Texas Public Service Company and the McCamey Sewer Company to recover damages for the death of the plaintiff's son, Clarence Laughead, a child nine years old at the time of his death on March 13, 1933.

Defendants owned a 10-acre tract of land adjacent to the city of McCamey upon which they maintained a sewerage disposal plant. The deceased fell into a cesspool on said tract, called an Imhoff tank, and was drowned. McCamey is a city of about 4,000 inhabitants.

The tract is in the form of a parallelogram, 700 feet by 622.9 feet. Its north boundary line is approximately 300 feet south of the city limits of McCamey, approximately 1,500 feet southwest of the nearest residence, and approximately 2,200 feet south of the residence of the deceased Clarence Laughead. Its northeast corner is approximately 1,900 feet southwest of the high school, and 2,200 feet southwest of the grade school. Its east boundary line is approximately 1,000 feet west of the Iraan public highway. The McCamey airport adjoins the tract on the northwest. While no regularly graded roads approached the tract, the old Bakersfield abandoned road cut across its southeast corner, a roadway worn by automobiles came from Johns street in McCamey southward to the tract, and two or three other similar trails made by automobiles approached the tract from town. Several other trails and footpaths probably ran onto the land and to the pool.

The tract was unfenced. It was covered with brush except for a distance of approximately 20 yards immediately adjoining the cesspool.

Upon the 10-acre tract was located, among other things, the cesspool in which Clarence Laughead met his death. The pool, or Imhoff tank, was a structure consisting of a concrete pit 10 feet wide, 22 feet long, and 26 feet deep. The curb surrounding the pool extended approximately 6 or 8 inches above the level of the ground. It was located 270 feet south of the north boundary line of the tract, and 100 feet west of its east boundary line. The pool was surrounded by a fence, the corner posts being 6 by 8 timbers, the south and west sides consisting of a net wire 3 feet high, above which were two strands of barbed wire; on the north and east sides there was only one or two strands of barbed wire about 4 feet above the ground.

The pool was equipped with a steel ladder in the southeast corner leading down into the interior of the pool. There were several partitions in the pool; a concrete partition running lengthwise about 18 inches from the east side and about 3 feet below the level of the top, and two wooden partitions, built of two by fours, with the edges up, as well as a concrete partition running across the west end of the pool at surface level. The pool was filled to within four or five feet of its top with liquid, sewage disposal matter, into which a continuous stream flowed from about the surface of the liquid, through a 12-inch pipe.

The deceased went upon the tract in company with Billy Garrett, a boy nine years old.

Garrett testified that he and deceased left deceased's house and went first to the airport to see an airplane and then on to appellant's premises. They entered the premises from the northwest. They evidently entered upon appellant's property at a point about 450 or 500 feet from the pool. The purpose for which the boys went upon appellant's tract was to see if they could find a place to dig a cave. They first played in the filter bed (called by the witness "a rock outfit"), which was located about 180 feet southwest of the pool. After they had played there a little while the deceased told the witness, Billy Garrett, he knew where the "real cesspool part was." They were about ten yards from the pool before they saw it. The two boys played around the pool about thirty minutes before the accident. They both threw rocks

into the pool, which sank below the surface. The exact manner in which the death of Clarence Laughead occurred can best be described by reproducing the following excerpts from the testimony of the witness, Billy Garrett:

"And there was a big old thick board—about that thick (indicating with hands), down on the bottom, and he got on that, and I was playing around there on top, kind of running around, and he reached down to see if it was hard and started to put his foot on it and his foot kind of slipped and he fell off, kind of on his back and kind of stirred around a little bit and put his hand up, while he was in there, for me to get his hand to try to pull him out and I kind of got down on the outfit and tried to reach his hand, but I couldn't reach his hand, and after that I stayed around a little bit until he went under, and then I went to Laughead's house and told him, and I went out there again.

"Q. This steel ladder that he went down there on—did you go down on that steel ladder also? A. No, sir.

"Q. Did he walk that cross-piece there? A. Over on that board, you mean?

"Q. Yes? A. Yes, sir, he walked on it a few times before he fell in—quite a few times before he fell, and then he got out once, and then he got back down in there.

"Q. You mean that he got out of the cesspool once and stayed for a while on the outside and that he then went back down in there? A. Yes, sir.

"Q. The second time that he went down in there, you say that he reached down and kicked the top—kicked down with his foot—what do you mean? A. Yes, sir, put his foot down there, reached down there with his foot.

"Q. Did you hear him kick out as soon as he put his foot down? A. No, sir, he brought his foot out, like this (indicating with foot).

"Q. And the foot that he put down there—he was trying to work his foot back—working to bring his foot up—bring it back up to the level with the other foot? A. No, sir, just brought it kind of up there, but he didn't quite get it all the way up on top, and he slipped.

"Q. Then he slipped and fell in, did he? A. Yes, sir."

In response to special issues submitted to it the jury found that the cesspool was especially and unusually attractive to children; that defendants should have known it; that this especial and unusual attractiveness of the cesspool caused Clarence Laughead to climb into it; that defendants were guilty of negligence proximately causing his death: (1) In failing to fence the entire tract; (2) in failing to place warning signs; (3) in failing to obstruct the roads leading toward the cesspool; (4) in failing to have a fence immediately around the cesspool of such character as to prevent the child from entering it; and (5) in failing to have a cover thereon. The jury further found that Clarence Laughead was not guilty of negligence in climbing down into the pool; that his death was not the result of an unavoidable accident; and that his parents were damaged to the extent of $3,000 prior to the child's reaching 21, and $7,000 thereafter.

Judgment for plaintiffs was rendered in accordance with such findings.

### Opinion.

The deceased must be considered to have been a trespasser upon the premises of appellant unless the facts bring the case within the doctrine of the so-called turntable cases or the "attractive nuisance" doctrine.

We shall not attempt the impossible task of harmonizing and reconciling the cases in this state involving the doctrine.

As applied to the present facts, it may safely be said, however, that no liability is shown unless it appears the deceased was lured upon the premises by something thereon which was especially and unusually attractive to children, from which an invitation to enter may be implied, or by virtue of some other fact children were accustomed to be upon the premises, of which custom the defendant had notice, actual or constructive.

Plaintiffs pleaded the cesspool and other structures upon the ten acre tract as having attracted and lured the deceased upon the same. The court submitted only the attractiveness of the pool and apparently no effort was made to show that any thing else attracted the deceased.

The evidence shows the deceased and his little companion, Billy Garrett, went first to the airport to see an airplane. The airport was to the northwest and adjoining the appellant's premises. The pool was surrounded by a curb extending 8 or 10 inches above the ground. The 10-acre tract was covered with sage brush, except for about 20 yards around the pool. It is doubtful whether the pool is visible from any point outside the premises from where the deceased entered. But if it was visible, it could not have been

928

very plain from such point, and there is nothing to show that its appearance was of such nature as would have attracted and lured children to it. Billy Garrett testified they went upon the premises to see if they could find a place to dig a cave. They first played in the filter bed called by the witness "a rock outfit." After playing there a while the deceased told Billy he knew where "the real cesspool part was." They then went to the cesspool and did not see the same until about ten yards from it.

These facts, as we view them, are insufficient to show that deceased was attracted by the pool and thereby lured upon the premises. For this reason no invitation to enter upon the premises can be implied against appellant. United Zinc & Chemical Co. v. Britt, 258 U. S. 268, 42 S. Ct. 299, 66 L. Ed. 615, 36 A. L. R. 28; McDermott v. Burke, 256 Ill. 401, 100 N. E. 168; Hardy v. Missouri Pacific Ry. Co. (C. C. A.) 266 F. 860; Hayko v. Colorado & Utah Coal Co., 77 Colo. 143, 235 P. 373, 39 A. L. R. 482; Missouri, K. & T. Ry. Co. v. Moore (Tex. Civ. App.) 172 S. W. 568.

In Flippen-Prather Realty Co. v. Mather (Tex. Civ. App.) 207 S. W. 121, 125, a child fell into an abandoned well on a vacant lot, in a settled section of the city of Dallas one block from a public school. In that case a recovery by the parents of the child was sustained, but it was shown "that children in considerable numbers were accustomed to play about the well and on the vacant block of ground upon which it was situated is undisputed in the evidence, and so frequently did they pass over this block of ground in going to and returning from school that a well-beaten path appeared on the ground and close to the well."

It was also shown that in the immediate vicinity of the well there were wild flowers, and the jury found the child was attracted to the well by its natural surroundings.

In the case at bar Ellsworth Stephens, aged 13, testified that he had been out to the cesspool three or four times. On cross-examination he testified that he had never been closer than ten feet from the cesspool, and when pressed as to why he did not go closer he answered:

"Oh, I was afraid I would fall in and I didn't like the smell."

"Q. You just didn't like that place, did you? A. No, sir.

"Q. And you did not want to go around there? A. No, sir, I didn't."

The witness, Roy Mitchell, aged 15, testified that he had been by the cesspool—had passed it going hunting and going back toward the Country Club. On cross-examination he was asked:

"Q. Do you like to go over to that place over there? (meaning the cesspool.) A. No, sir.

"Q. Do you see anything likeable about it? A. No, sir.

"Q. It smells terrible? A. Yes, sir."

The witness, Claude Garrett, aged 11, testified that he had been by the cesspool twice on his way to go hunting. He testified further that he had never been closer than about ten feet from the cesspool. On cross-examination he was asked the following questions:

"Q. Did you throw any rocks in there? A. No, sir.

"Q. Did you go up to the edge of it and look into it? A. No, sir.

"Q. Did you climb down the ladder in there? A. No, sir.

"Q. Why didn't you climb down the ladder? A. It just didn't attract my mind—I was going hunting."

This testimony fails to show that the cesspool was unusually attractive to children or that they were accustomed to resort to the 10-acre tract for play or any other purpose. For this reason the Flippen-Prather Realty Co. Case has no present application.

The presence of straggling roads and trails leading to the tract and pool is unimportant. There were no roads or trails leading from the airport, whence the deceased and his companion came upon the tract. There was no causal connection between such roads and trails and the entry of the children upon the premises.

In this case it is manifest the two little boys had wandered from their homes upon pleasure bent, and the remarks of Chief Justice Gaines in reversing a judgment awarding damages in Missouri, K. & T. R. Co. v. Edwards, 90 Tex. 65, 36 S. W. 430, 432, 32 A. L. R. 825, are appropriate. Judge Gaines in that case said: "But when it is said that it is enough that the object or place is attractive or alluring to children, and when it is said, as has been intimated, that the fact that they resort to a particular locality is evidence of its attractiveness, the question suggests itself, what object or place is not attractive to very young persons who are left free to pursue their innate propensity to

wander in quest of amusement? What object at all unusual is exempt from infantile curiosity? What place, conveniently accessible for their congregation, is free from the restless feet of adventurous truants?"

Our conclusion is that the evidence is insufficient to sustain the theory of defendant's liability under the attractive nuisance doctrine, for which reason the judgment should be reversed and here rendered.

It will be so ordered, but we realize the Supreme Court may grant a writ of error and reverse our ruling. To avoid the possibility of a remand to this court to pass upon other questions presented involving issues of fact we will, without discussion, announce our rulings upon such other questions.

The tender age of the deceased made it an issue of fact whether he was responsible for his own negligence. Duron v. Beaumont Iron Works (Tex. Com. App.) 7 S.W.(2d) 867.

The evidence does not raise the issue of unavoidable accident for which reason the error in improperly placing the burden of proof upon appellant in issue No. 20 is harmless.

The evidence raised the issue of contributory negligence on the part of the deceased in the matter referred to in defendant's requested issue No. 3, for which reason such issue should have been submitted.

Misconduct on the part of the jury as charged in the ninth and tenth propositions is shown, which is of such nature as requires reversal.

Reversed and rendered.